# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs September 3, 2014

## SHAIRIQ SEABROOKS v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
**No. 06-00034      James M. Lammey, Jr., Judge**

---

**No. W2013-02321-CCA-R3-PC - Filed December 15, 2014**

---

The petitioner, Shairiq Seabrooks, was convicted of second degree murder and sentenced to confinement for twenty-two years. His conviction was affirmed by this court, and our supreme court denied his application for permission to appeal. State v. Shairiq Seabrooks, No. W2008-00443-CCA-R3-CD, 2009 WL 3103792, at *1 (Tenn. Crim. App. Sept. 29, 2009), perm. app. denied (Tenn. Mar. 15, 2010). Thereafter, he filed a timely petition for post-conviction relief, alleging ineffective assistance of counsel. After an evidentiary hearing, the post-conviction court denied relief, and the petitioner timely appealed. Following our review, we affirm the denial of relief by the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which ROBERT W. WEDEMEYER and ROBERT L. HOLLOWAY, JR., JJ., joined.

Shairiq Seabrooks, Pikeville, Tennessee, Pro Se (on appeal); Bradley J. Eiseman, Memphis, Tennessee (at hearing), for the appellant, Shairiq Seabrooks.

Herbert H. Slatery, III, Attorney General and Reporter; Lacy Wilber, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Glen Baity, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTS

This court's opinion in the direct appeal of the petitioner's conviction set out the evidence against him:

Constance Coleman identified the victim, Ozell Faulkner, as her son. She confirmed that he was also known as Ozell Jordan. Ms. Coleman stated that in December of 2005, the victim was twenty-one years old and lived with her on Pope Street, near Mitchell's Grocery Store.

Delvin Jones testified that the victim was his cousin. At the time of the shooting, Mr. Jones and the victim spent a lot of time together in the area of Memphis where the victim lived with his mother. He said that they went to Mitchell's Grocery almost every day. At approximately eight o'clock p.m. on December 3, 2005, Mr. Jones met the victim on Mount Olive Street and they walked to his mother's house where the victim used the telephone. They then walked to "Candyman Joe's" house to buy cigarettes and then to Mitchell's Grocery. Mr. Jones stated that while he was at the store he saw "David Bibbs, Michael Smith, [and] Peanut." Mr. Jones explained that "Peanut" was the [petitioner's] nickname. Mr. Jones said that he had seen the [petitioner] around the neighborhood and only knew him by his nickname. According to Mr. Jones, Mr. Bibbs, Mr. Smith and the [petitioner] were members of the Bloods gang and were wearing red clothes on the night of the shooting. The [petitioner] had the initials "CK" tattooed on his face. Mr. Jones explained that "CK" meant "Crip Killer."

After Mr. Jones bought cigarettes, he and the victim left the store, but they remained outside. The [petitioner], Mr. Bibbs, and Mr. Smith followed them out of the store and the [petitioner] approached the victim and asked "[w]here the birds at?" As the [petitioner] stood in front of the victim, he held a beer in his right hand and held his side with his left hand. Mr. Jones said that the victim asked the [petitioner] what he meant and the [petitioner] "just walked off." The [petitioner], Mr. Bibbs, and Mr. Smith headed down Chelsea Street, but they returned to the store about fifteen minutes later. The [petitioner] walked up to the victim and stood in front of him holding his side with his right hand and holding the bottom of his coat with his left hand. Mr. Smith and Mr. Bibbs stood on each side of the [petitioner]. The [petitioner] asked the victim "where it's at?" Mr. Jones said that the victim "just started laughing at him" and the [petitioner] pulled a twelve gauge sawed off shotgun out of his coat and shot the victim. Mr. Jones ran into the store and "told Ms. Sarah [Mitchell] to call the police." As he was running into the store, Mr. Jones heard two or three more shots, but does not know what gun was used. After he asked Sarah Mitchell to call the police, Mr. Jones returned to the victim and a crowd of people had started to gather at the scene. He remained with the victim until the paramedics arrived. Mr. Jones said that nothing was

taken from or left at the scene while he waited for the police.

On the night of the shooting, Mr. Jones was brought to the police station where he gave a statement. The police showed him photospread sheets and he identified Mr. Smith on one of the sheets and wrote on the sheet, "Mike Smith[,] he was the person that I saw at the shooting with Peanut." Mr. Jones also identified Mr. Bibbs on a photospread sheet and wrote on the sheet, "[t]his was the person with Peanut." On the following day, Mr. Jones identified the [petitioner] as "Peanut" on a photospread sheet.

Mr. Jones stated he was unaware of any gang involvement by the victim and denied that he was in a gang. He further denied that the victim was armed or had given the impression that he had a weapon while they were at Mitchell's Grocery. He stated that the victim did not threaten the [petitioner]. On cross-examination, Mr. Jones testified that the area "was a gang neighborhood" with an even split of Crips and Bloods. Regarding his statement to police that the victim was a Crip, Mr. Jones stated that the victim "used to be around" the Crips, but he claimed that he did not know that the victim was a gang member.

Sarah Mitchell, the owner of Mitchell's Grocery, testified that at eight o'clock p.m. on December 3, 2005, the victim came in the store and asked for a cheeseburger. Ms. Mitchell told him the kitchen was closed and he left the store. Three or four minutes after the victim left, she heard one shot outside and she ran towards the back of the store. Ms. Mitchell stated that she "heard some shots, and when [she] came back out and headed back to the front [Mr. Jones] met [her] coming in the door and told [her] to call 9-1-1[.]" She stated that Mr. Jones was not armed. On cross-examination, Ms. Mitchell stated that the victim came in the store only one time that day, right before the shooting.

Officer Tyont Shabazz with the Memphis Police Department testified that on December 3, 2005, he went to Mitchell's Grocery Store in response to a "shot fired, man down" call. Officer Shabazz stated that when he and his partner arrived to secure the scene, they found the victim of the shooting lying on the ground in a pool of blood and unconscious. Officer Shabazz did not see any weapons near the victim nor did he notice anyone at the scene wearing gang colors. Officer Shabazz stated that his report indicated that "Mr. D. Jones" came forward as a witness and provided information about the shooting.

Gary Gordon, EMT with the Memphis Fire Department, testified that on December 3, 2005, he responded to a call reporting a gunshot victim at Mitchell's Grocery. Mr. Gordon accompanied a paramedic to the scene where they found a "young African-American male lying on the ground with a gunshot wound." Mr. Gordon rolled the victim over and placed "his intestines . . . back on his stomach" so they could load him into the ambulance. He stated that he did not observe any weapons around the victim. On cross-examination, Mr. Gordon stated that eight minutes passed from the initial call until they arrived on the scene.

Officer Delmar Wells with the Memphis Police Department testified that he collected evidence from the crime scene. Officer Wells stated that he photographed the scene and tagged two piles of clothing found at the scene that appeared to be wet with blood. Officer Wells identified a photograph of a blue jacket and a blue and white shirt soiled with what appeared to be blood. As part of his investigation, Officer Wells searched a dumpster located next to Mitchell's Grocery and the area around the store, but he did not find a weapon. On cross-examination, Officer Wells reviewed his report and stated that he tagged other clothing stained with what appeared to be blood. He identified a photograph that he took of the area around the store and stated the photograph depicted two areas on the ground that appeared to be wet. He agreed that the photograph did not indicate that there was anything on the ground by the corner of the store.

Hersell Seabrooks testified that the [petitioner] was her nephew. Ms. Seabrooks stated that she lived in Gainesville, Florida. She said that years ago, the [petitioner] lived with her family in Florida for a short period of time, but Ms. Seabrooks' mother sent him back to Tennessee. On December 14, 2005, Ms. Seabrooks contacted the sheriff's department to request information on a warrant that had been issued on the [petitioner]. She found the [petitioner's] belongings at her mother's house and found the [petitioner] down the street from her mother's residence. Ms. Seabrooks stated she took the [petitioner] to her house and called the sheriff's department. Officers came to her home and arrested the [petitioner].

Officer William Merritt with the Memphis Police Department testified that on December 27, 2005, he accompanied the case officer, Sergeant Justice, to a jail in Florida to retrieve the [petitioner]. Officer Merritt stated that the [petitioner] was advised of his Miranda rights, and that he voluntarily made a statement. Referring to the [petitioner's] statement, Officer Merritt testified

-4-

that the [petitioner]:

> told us that he had been threatened or been involved in some
> type of feud with [the victim] and other people that [the victim]
> knew. He told us that the day the shooting occurred that he had
> gone up to the store where the shooting occurred on Chelsea
> earlier in the afternoon, and when he was up there he noticed
> [the victim] and people that [the victim] knew up there.

> He felt uncomfortable because he left the store after making a
> purchase and went about his way. [The petitioner] [t]old us
> later on that evening he went back up to the store once night
> fell, once again he saw [the victim] up there, and as he came out
> of the store [the victim] and some other people that were with
> him appeared like they were going for weapons and when that
> happened [the petitioner] told us he pulled his weapon and
> fired.

Officer Merritt stated that the [petitioner] took "[f]ull responsibility"
for the shooting. The statement also included the [petitioner's] claim that:

> for about a month prior to this time, [the victim's] partners
> pistol played [him]. [The petitioner would] be standing on Pope
> Street and they would repeatedly walk past [the petitioner] and
> showed [him] guns and would have word out telling others that
> [he] was a dead man walking.

The [petitioner] stated he did not know the names of the others but
knew "they were Crips" and that he saw "pistol prints" in the victim's pockets.
He claimed that whenever he saw the victim, he would grab his pistol to make
the [petitioner] "aware that he had one."

Dr. Kenneth Snell, a forensic medical examiner, testified that he
performed an autopsy on the victim's body and identified a photograph taken
of the victim's head. He described the victim as a twenty-one year old
African-American male with a height of sixty-six inches and weighing 116
pounds. The victim had received medical treatment before his death and had
a one-forth inch diameter circular hole in the midline of his abdomen with a
small rim of abrasions and smaller bruising around the abrasions. The wound
in the abdomen was consistent with an entrance gunshot wound created by a

shotgun. In his autopsy report, Dr. Snell identified injury to the large and small intestines and to the iliac artery and vein. Dr. Snell stated that shotgun wadding and pellets were recovered from the area of the shotgun wound. The victim also had a second, smaller wound to his right mid-back consistent with an entrance gunshot wound. Dr. Snell stated that a medium caliber copper jacked projectile was recovered from the second wound. He testified that in his opinion, the cause of the victims death was a shotgun wound to the abdomen. Dr. Snell estimated that at the time of the shooting, the distance from the victim's body to the end of the barrel of the shotgun was three to four feet. On cross-examination, Dr. Snell explained that the second wound had an upward trajectory consistent with a shot from a handgun held by someone located to the victim's left.

Sergeant Connie Justice with the Memphis Police Department testified that she was the case coordinator in this investigation. She testified that she took the [petitioner's] statement regarding the evidence, Sergeant Justice testified that she "submitt[ed] the evidence, the bullets or the fragments and buckshot . . . obtained out of the body of the victim, and took them to [the Tennessee Bureau of Investigation] and requested testing on those items." On cross-examination, Sergeant Justice said the [petitioner] "mentioned something about David [Bibbs] being young and sometimes young kids get in trouble, and that [the petitioner] didn't want that to happen [to] David Bibbs so that he was going to take all the blame." She stated that her investigation indicated that more than one gun was at the crime scene. In addition to the shotgun pellets and shotgun wadding, there was a bullet fragment from a separate weapon found in the body of the victim. The Tennessee Bureau of Investigation (TBI) reported that the bullet fragment obtained from the victim's body appeared to have been from a .38 caliber gun. Sergeant Justice confirmed that a supplement to the investigation report indicated that a witness stated that "after the victim had been shot and was lying on the ground . . . other people had guns[.]" Alex Brodhag, a firearm's examiner with the TBI, examined the evidence that was recovered from the victim and identified a "38 caliber class bullet," shot wads from a 12 gauge shot shell, and nine pellets of buckshot from a shotgun shell.

In an offer of proof by defense counsel, Lieutenant Dorothy Hyman with the Memphis Police Department testified regarding her arrest of the victim. Lieutenant Hyman stated that on October 7, 2005, the victim was arrested after having been found in possession of a 306 Winchester Rifle at a residence on Pope Street. A companion arrest was also made in connection

-6-

with the same incident charging the arrested individual with unlawful possession of a .9 millimeter handgun. The [petitioner] also testified during the offer of proof. He stated that he recognized the address on Pope Street and stated the arrests took place near the house where he was residing at the time of the arrest.

The [petitioner] testified that in 2001, he was attending Craigmont High School and living on Douglas Street in an area known as "Little Chicago." Soon after he moved to the neighborhood, he was approached by members of the Crips' gang and invited to join. The [petitioner] declined the invitation and he was told he would "roll with them or get . . . rolled over." He befriended some members of the Bloods' gang who looked out for him. The [petitioner] said that he later joined the Bloods. In the beginning of 2005, the [petitioner] got his face tattooed with "CK." He explained that "CK" stood for "Crip Killer" but he claimed that he did not "mean any harm when [he] got it . . . [he was] really trying to look cool and fit in." The [petitioner] said that he got along fine with the victim until he got the tattoo. After he got the tattoo, the victim "quit hanging with [the petitioner] and . . . [told the petitioner] if [he] didn't get the tattoo removed that he was going to shoot it off[.]" The [petitioner] said that the victim continued to threaten him "on a constant basis" and that he agreed to have his tattoo removed. However, the [petitioner] wanted to "get it covered up professionally and that cost a bit of money." According to the [petitioner], the victim and his partners continued to harass him and would sometimes threaten him by pulling out guns. He said that they also "threw up gang signs" at him.

The [petitioner] said that at the time of the shooting, he carried a shotgun with him almost all the time and was armed when he entered the store in the afternoon. The [petitioner] returned to Mitchell's Grocery that night. The victim, Mr. Jones, and four other Crips followed him out of the store and "walk[ed] up on [him] as [he] was walking away reaching for guns, and . . . [he] reacted to the situation and defended [himself] by pulling [his gun] . . . shot one time" and ran. The [petitioner] thought that they "were trying to kill" him and stated that he knew that they had guns because before he entered the store, he saw the "print of the gun but they were holding [it] through the jackets so [he] couldn't describe the gun."

On cross-examination, the [petitioner] stated that he saw Mr. Bibbs in the store before the shooting, but he did not see Michael Smith. The [petitioner] assumed that one of the victim's partners might have shot the

-7-

victim in the back because they had guns and were standing behind him. He said that he knew that the victim, Mr. Jones, and another guy had guns and that they were reaching for them when he shot. The [petitioner] estimated that the victim was three to four feet from him when he shot. The [petitioner] denied that the reason he came back to the store that day was to confront the victim because he had gotten his dope. He stated that "bird" can refer to cocaine, but he denied asking the victim "where the birds at?" He claimed that he began to carry the shotgun around all the time for protection after he "got jumped on" and his arm was broken with a metal pipe. On redirect examination, the [petitioner] said that Michael Smith had been killed by members of the Crips' gang.

Undrey Murphy testified that on the night of the shooting, he was with Michael Smith at Pope and Mount Olive Streets when they heard five or six gunshots. Mr. Murphy said that a few minutes before he heard the shots, he saw his brother walking in the direction of the store. Upon hearing the shots, Mr. Murphy went with Mr. Smith to Mitchell's Grocery where they saw the victim on the ground with ten to fifteen people gathered around. On cross-examination, Mr. Murphy said that he met up with Mr. Smith earlier in the day. Mr. Murphy said that he was with Mr. Smith at the store at about three o'clock in the afternoon. He said that they talked to some guys outside of the store for about forty-five minutes and then they went to Pope and Mount Olive Streets where they heard the shots. On redirect examination, Mr. Murphy agreed that he was nervous testifying and that it was possible that he and Mr. Smith went to Pope and Mount Olive Streets two times that day. He said that Mr. Smith was now deceased. On recross-examination, Mr. Murphy denied that he was giving incorrect times to try to take Mr. Smith away from the crime scene at the time of the shooting.

Colonious Davis, manager of outpatient operations at the Regional Medical Center (the Med), identified an emergency department record dated November 15, 2005, documenting treatment for the [petitioner]. Mr. Davis stated that the record indicated that the [petitioner] was treated at the Med for a broken arm. On cross-examination, Mr. Davis stated that the record reports that the [petitioner] "complain[ed] of left forearm pain after being hit by a lead pole while in a fight."

Id. at *1-6.

Subsequently, the petitioner timely sought post-conviction relief, making various

-8-

claims against the effectiveness of his counsel, both at trial and on appeal. Although the petitioner testified as his final witness, we will review his testimony first to provide context for the testimony of his counsel and a fellow member of the Bloods street gang.

At the evidentiary hearing, the petitioner testified as to his complaints against his prior counsel. He said that counsel had not raised as an issue on appeal that the trial court "coerc[ed] an agreement upon the jury's verdict and misstated the issue in [the] new trial motion." In the petitioner's view, the jury was unable to reach a verdict, before being coerced by the court to do so, and a mistrial should have been declared. The petitioner continued his list of complaints by asserting that trial counsel should have sought a curative instruction after the State had misled the jury "with statements entirely outside of [the] evidence that the case centered around an attempt to rob for cocaine." The jurors, the petitioner speculated, took "into consideration in arriving at their verdict." This occurred even though the count was dismissed.

Additionally, counsel failed to call certain witnesses who were willing to testify as to the petitioner's exercising his right to self-defense. Further, counsel was ineffective by not seeking to strike the name of a co-defendant, David Bibbs, from the indictment, for this inclusion enabled the State to "manipulate evidence" showing premeditation instead of self-defense, as was the case. Counsel was ineffective in that he was unsuccessful in convincing the court to allow into evidence an affidavit of a witness, Michael Smith, who had died before the trial. Further, counsel should have raised as an issue on appeal the fact that the court had not allowed proof that the charges against co-defendant David Bibbs had been dismissed. Also, the State should not have been allowed to present proof that the phrase "Crip Killer" had been tattooed on his face, for it had been removed prior to the trial.

Further, the petitioner complained that, a number of times, the prosecution expressed "personal belief as to falsely [sic] testimony in [the petitioner's] guilt and personal opinion as to [the] credibility of issues." Also, he asserted that the State argued "the jurors should convict to protect themselves in the community, suggesting that the [petitioner] was dangerous" and that "an acquittal [of the petitioner] [would] encourage[] lawlessness." We note that, although the petitioner itemized by line and page the allegedly improper statements, no explanation was given as to why the statements were improper. As to the State's closing argument, the petitioner asserted that "[t]he whole argument, everything, it was unconstitutional. That's the point." He opined, "I could have raised [the issue of improper arguments] on direct appeal and guaranteed got a reversal." The petitioner next claimed that the trial court had "informed [the jury] to disregard the rest of the self-defense instructions if they didn't find that [he] was assaulted."

At the evidentiary hearing, the petitioner's trial counsel testified that he had practiced

law for seventeen years as a criminal defense attorney and had handled between fifty and one hundred murder trials. In his representation of the petitioner, he reviewed the indictment and said he did not believe that the voluntary dismissal of charges against a co-defendant benefitted the petitioner.

Regarding the trial of the charges against the petitioner, counsel did not recall that the State had made improper remarks during the opening statement and that he would have said something had that been the case. He remembered that the State had made references to the tattoo on the petitioner's face. His trial strategy was that the petitioner had been threatened by the Crips street gang and that the matter either was a case of self-defense or voluntary manslaughter. Although the State had made references to drugs during its opening and closing statements, he had not objected. He had not asked for a curative instruction in this regard because the felony murder charge had been dismissed. Although Alexander Wilson was under subpoena and present at the trial, counsel had not presented him as a witness because he knew of threats against the petitioner only from statements by him. Another potential witness, Michael Smith, had made a pretrial affidavit that he first saw the victim's body in the street with a pistol beside it, but later the pistol was gone. Although Mr. Smith had died before the trial, the court would not allow the affidavit into evidence. The court did not allow testimony by Lieutenant Hyman as to a recent arrest of the victim on a gun charge because he was not a victim.

Regarding potential defense witnesses, counsel said his investigator had been unable to locate any persons admitting to having seen the shooting. He said that another lawyer had handled the appeal of the conviction. Counsel said that he had been surprised by the verdict, believing it would be "voluntary manslaughter or self-defense" and, at the sentencing, had argued that certain mitigating factors should be applied.

Alexander Wilson testified that the petitioner was a "gang member of mine." He had received a subpoena to the trial, and had attended, but was not called to testify. If he had, he would have talked about "what was going on in the neighborhood, between, you know, Seabrook and the defendant [sic]." On cross-examination, he said that he was still a gang member, that the victim had been a member of the Crips, while he and the petitioner were members of the Bloods.

## ANALYSIS

Initially, we note that the petitioner's claims are so broad as to criticize most of counsel's activities before, during, and after the trial. They are so numerous and detailed that it is difficult to try and fit together the very lengthy original and amended post-conviction petitions, the evidentiary hearing testimony, and the also lengthy and detailed

-10-

appellate brief of the petitioner. Further, it appears that the petitioner has abandoned some claims he made during the evidentiary hearing, which were ruled upon by the post-conviction court and, in his appellate brief, raised new claims or, at least, rephrased previous ones, so that we cannot determine if they have been presented other than on appeal.

The post-conviction petitioner bears the burden of proving his allegations by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. See Tidwell v. State, 922 S.W.2d 497, 500 (Tenn. 1996). Where appellate review involves purely factual issues, the appellate court should not reweigh or reevaluate the evidence. See Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997). However, review of a trial court's application of the law to the facts of the case is *de novo*, with no presumption of correctness. See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed *de novo*, with a presumption of correctness given only to the post-conviction court's findings of fact. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001); Burns v. State, 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner has the burden to show both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding. Strickland v. Washington, 466 U.S. 668, 687(1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The Strickland standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland, 466 U.S. at 688; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). Moreover, the reviewing court must indulge a strong presumption that the conduct of counsel falls within the range of reasonable professional assistance, see Strickland, 466 U.S. at 690,

and may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. See Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). The prejudice prong of the test is satisfied by showing a reasonable probability, i.e., a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.

Courts need not approach the Strickland test in a specific order or even "address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697; see also Goad, 938 S.W.2d at 370 (stating that "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

We will review the petitioner's appellate issues, as we understand them.

## I. Trial Court's Coercing a Jury Verdict

The petitioner testified at the evidentiary hearing and continues on appeal that the trial court should have declared a mistrial when it became apparent that the jury could not agree on a verdict, but, instead, refused to grant a mistrial and coerced the jury into a verdict of guilty. In his view, trial counsel should have raised this claim as an issue on appeal.

As to this claim, the post-conviction court found that the statement of the trial court on which the petitioner based this claim "was taken largely out of context when compared to the discussion surrounding it as well as when comparing it to the rest of the transcript." After reviewing the trial transcript, the post-conviction court concluded that the trial court had been "careful" to neither influence nor take part in the jury deliberations but "to allow the jury to do its duty earnestly and completely." Accordingly, the post-conviction court found that, as to this claim, the petitioner failed to show either that counsel had been ineffective or that he had been prejudiced because the matter had not been raised on appeal. The record supports this determination.

## II. Counsel's Failure to Object to Improper Remarks by the State

The petitioner prefaces his arguments on this issue by observing that the case against him "was relatively weak." We disagree. Delvin Jones testified that he saw the petitioner produce a sawed-off, twelve-gauge shotgun from beneath his coat and shoot the victim. The petitioner admitted doing so but claimed he acted in self-defense. Obviously, the jury accredited the testimony of the eyewitness and not the petitioner's proof that he acted in self-defense. The State's proof was strong, not "relatively weak."

-12-

At the evidentiary hearing and in his appellate brief, the petitioner details a very large number of allegedly improper statements by the prosecution throughout his trial. He asserts that counsel was ineffective for not seeking curative instruction as to these statements. The post-conviction court observes that the trial court instructed the jury both before opening statements and closing arguments that the arguments of counsel were not to be considered as evidence. It is true that on multiple occasions the State characterized the petitioner as a "Crip killer." According to the petitioner, these statements were epithets and, thus, improper, were comments of personal belief as the "falsity of any testimony or evidence on the guilt of the [petitioner]" and his "credibility." As to these claims, defense counsel testified at the evidentiary hearing that he did not recall the State's making improper statements and would have "said something" if that had been the case.

As to these various claims, the post-conviction court determined that the assailed statements by the State did not affect the outcome of the case. In fact, the court noted that the petitioner, himself, testified that the "CK" tattoo on his face had stood for "Crip Killer." Further, the post-conviction court noted that the petitioner's complaints as to prejudicial statements encompassed "essentially the whole of opening statements and closing arguments." The court concluded that the State's arguments had been supported by the evidence and that if any of the statements had been improper, the error likely would have been harmless and, thus, the petitioner had failed to establish prejudice. We agree. These claims are without merit.

### III. State's Instructing Jury to Disregard Applicable Law in Reaching a Verdict

On appeal, the petitioner argues that "the prosecution instructed the jury to [disregard] the element of the self[-]defense law concerning an apprehension of danger." His brief does not allege how or when the State did as he claims, nor make reference to the hearing transcript regarding any such testimony. Accordingly, this claim is waived.

### IV. Additional Complaints Regarding State's Closing Argument

The petitioner lists numerous additional complaints regarding the State's argument, listing page and line number as to the allegedly improper statements. Again, however, he makes no reference to the hearing transcript as to any testimony about these statements. Accordingly, we are faced with the task of combing the transcript to see if an issue was raised at the hearing as to a specific page number or line of the trial transcript. This, we decline to do. Accordingly, this claim is waived because it includes no references to relevant testimony at the evidentiary hearing.

## V.  Petitioner's Trial on Indictment Also Bearing Name of Co-Defendant

At the evidentiary hearing, the petitioner complained that trial counsel had been ineffective in that he did not move to strike the name of a co-defendant, who was not being tried, from the indictment.  As to this claim, the post-conviction court found that the petitioner had failed to show that the fact he was tried on an indictment which also named a co-defendant amounted to ineffective counsel or that he had been prejudiced thereby.  On appeal, the petitioner presents the same argument as he made to the post-conviction court.  We conclude that the record supports the court's determination that the petitioner failed to show counsel was ineffective in this regard or that he was prejudiced thereby.

## VI.  Dismissal of Charges as to David Bibbs

The petitioner argues that counsel was ineffective for not appealing the refusal of the trial court to allow evidence that the charges against David Bibbs had been dismissed.  As to this claim, the post-conviction court found that the petitioner had failed to cite any authority for his belief that this evidence was admissible.  Accordingly, counsel's not pursuing the admission of such evidence was not ineffective.  The record supports this determination.

## VII.  Defense Witness Not Called to Testify

The petitioner argues on appeal, as he did during the evidentiary hearing, that counsel was ineffective for not calling Alexander Wilson to testify at the trial. This witness testified at the hearing that he was a member of the Bloods street gang, as he had been at the time of trial.  He agreed that the petitioner was a gang brother and said he was "always going to be a family member of mine if he [is] in a gang or not."  He said that, several days before the killing for which the petitioner was convicted, he had seen the petitioner "having words" with the victim and his gang associates. As the witness pulled up in his vehicle, the victim and his associate walked away.  He did not see the victim with a weapon.

The post-conviction court explained why trial counsel had made a reasonable strategic decision not to call this witness to testify at the trial:

> In this case, the witness, Alexander Wilson[,] testified to being a gang member with petitioner, and could not affirmatively testify to having ever seen petitioner threatened.  At [the] hearing, the witness testified that he only knew of threats to petitioner by what petitioner had told him.  Trial counsel testified that he did not believe Mr. Alexander's testimony was admissible because it was hearsay evidence.  Further, trial counsel testified that petitioner was able

-14-

to testify to the same threats during the trial.

In his appellate brief, the petitioner complains at length, and in great detail, that, by not objecting to improper arguments of the State, "counsel allowed jurors to be [misled] with facts not in proof that David Bibbs and Michael Smith were involved [with] the alleged crime, and specifically shot the alleged victim in the back." This argument has been substantially altered from that made to the post-conviction court regarding David Bibbs. Accordingly, we conclude that the argument is waived.

## **CONCLUSION**

We conclude that the record supports the determination of the post-conviction court that the petitioner has failed to establish either that counsel was ineffective or that he was prejudiced thereby. Accordingly, we affirm the order of the post-conviction court denying relief.

_____
ALAN E. GLENN, JUDGE